**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**James Gerald BRYAN,
Defendant–Appellant.**

No. 87–3059.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 3, 1988.

Decided Jan. 18, 1989.

Steven T. Wax, Federal Public Defender, Portland, Or., for defendant-appellant.

Charles W. Stuckey, Asst. U.S. Atty., Portland, Or., for plaintiff-appellee.

Before WALLACE and REINHARDT, Circuit Judges, and HARDY,* District Judge.

WALLACE, Circuit Judge:

Bryan appeals his conviction of twenty counts of mail fraud in violation of 18 U.S.C. § 1341, one count of conspiracy to defraud the United States in violation of 18 U.S.C. § 371, twenty-eight counts of aiding the preparation of false tax returns in violation of 26 U.S.C. § 7206, and two counts of willful failure to file corporate tax returns in violation of 26 U.S.C. § 7203. We vacate Bryan's convictions and remand for further consideration of his discovery requests.

I

In 1985, the grand jury in the District of Oregon returned a 51 count indictment charging Bryan and three other defendants with, among other things, 20 counts of mail fraud in violation of 18 U.S.C. § 1341. According to the indictment, Bryan devised a scheme intended to defraud both a class of taxpayers, who were induced by a series of misrepresentations to invest in illegal tax shelters created by Bryan and his co-defendants, and the United States Treasury, which was deprived of tax revenue as a result of the tax shelters. The tax shelters promoted by Bryan were advertised and marketed at seminars targeted at upper-income taxpayers, such as doctors and dentists. Bryan promoted the first shelter by advising taxpayers that they could obtain favorable tax benefits by becoming "ministers" of the "Congregational Church of Human Morality" (Church), an organization created by Bryan in 1974. For a fee, a

"minister" could form a "parish" of the Church. Thereafter, the taxpayer would make a large "contribution" to the Church, which the taxpayer would claim as a charitable deduction. Ninety-five percent of the contributions would then be returned by the Church to the "parish" of the taxpayer who made the contribution. This money was ostensibly for "parish use," which, the taxpayers were told, could be for anything the taxpayer wanted. The indictment alleged that the taxpayers induced to participate in this scheme were falsely assured that the money contributed to the Church could lawfully be claimed as charitable deductions on their tax returns.

The second shelter consisted of inducing investments in a company called Harvard Investment Management Corporation (Harvard). The investor would pay a fee to establish a commodity trading account in the name of a Subchapter S corporation established for each investor. The investors were told that Harvard would engage in commodity straddle trades that would produce deductible losses far in excess of the taxpayer's investment. According to the indictment, no commodity trades were actually made by Harvard, and no deductible losses resulted. Instead, Bryan and his co-defendants prepared false commodity confirmation slips and monthly activity statements purporting to show substantial losses for each Harvard investor, thereby inducing the investors to claim fictitious losses on their Small Business Corporation Income Tax Returns. The indictment also alleged that Bryan and his co-defendants diverted some of the money invested by each taxpayer in Harvard for their own use and benefit.

Prior to trial, Bryan moved for discovery of documents and witness statements obtained through a nationwide investigation of his activities coordinated by the National Office of the Internal Revenue Service (IRS). In his motion, Bryan sought materials both within and outside the District of Oregon. He grounded his motion both on

---

* Honorable Charles L. Hardy, United States District Judge, District of Arizona, sitting by designation.

Federal Rule of Criminal Procedure 16 and *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (*Brady*). Bryan demanded production of any records of interviews with or testimony of members of the taxpayer class described in the indictment, opinion letters written by attorneys regarding the legality of Bryan's various tax shelters, brochures and other materials describing the contents of his seminars, and similar materials intended to show that Bryan had intended to comply with federal tax laws and had not made misrepresentations when promoting either membership in the Church or investments in Harvard.

The district judge ordered the prosecution to produce any materials in its possession that might tend to exculpate Bryan, but found that reports of interviews with witnesses in which false representations were not reported were neither exculpatory nor material. She also ruled that the prosecution was not required to produce any material outside the District of Oregon. In a later ruling clarifying her earlier discovery order, she specifically agreed with Bryan's contention that attorney opinion letters, brochures, and seminar outlines were material to Bryan's defense, and ordered the prosecution to produce these items. This order, however, did not reverse the earlier order limiting discovery to items within the District of Oregon.

Bryan also moved unsuccessfully to dismiss Counts 1–20 of the indictment as duplicitous. He argued that the indictment must be read to allege two distinct schemes because Bryan was alleged to have intended to defraud two distinct classes of victims: taxpayers who participated in the shelters, and the United States Treasury. The district court rejected his argument and denied the motion.

The core of Bryan's trial defense was that while Bryan aggressively sought to aid his clients and Church members in reducing their taxes, he believed at all times that his actions were legal. He did not testify on his own behalf, but instead attempted to present his lack of intent defense through witnesses whose testimony described Bryan's philosophy and attested to his integrity. The jury found Bryan guilty on each of the 51 counts in the indictment.

Bryan brings several challenges to his convictions in this appeal. First, he contends that the district court erred in denying him discovery of material and exculpatory information both within and outside the District of Oregon. Next, he renews his argument that Counts 1–20 of the indictment charging him with mailings pursuant to a scheme to defraud taxpayers and the United States were duplicitous. As a corollary to this argument, Bryan contends that a jury instruction describing the scheme as one "to defraud a group of taxpayers and/or the United States of America" created a grave danger of a non-unanimous verdict and that the district court erred by failing to give a specific unanimity instruction requiring the jury to agree on the existence of the facts underlying the scheme. Bryan also challenges several evidentiary rulings of the district court, the failure of the district court to grant his motion for partial acquittal, and several allegedly misleading or incomplete jury instructions. We address his claims in turn.

## II

Bryan mounts two challenges to the district court's discovery rulings. First, he contends that the district court erred as a matter of law in denying him discovery of out-of-district documentary evidence that was either material to his defense or which belonged to him within the meaning of Federal Rule of Criminal Procedure 16(a)(1)(C). Second, he contends that much of this same documentary evidence was exculpatory within the meaning of *Brady*, but that the prosecutor concluded its *Brady* obligation stopped at the district's borders. Thus, he contends that the district court abused its discretion in ruling that certain information he sought from the government, namely, evidence of certain statements made by members of the taxpayer class allegedly defrauded by Bryan's scheme, was neither material within the

meaning of Rule 16(a)(1)(C) nor exculpatory within the meaning of *Brady.*

The prosecution responds that it was not obligated by Rule 16(a)(1)(C) to produce any out-of-district documents seized pursuant to the nationwide investigations of Bryan's activities conducted by the IRS. It argues further that the discovery requested by Bryan, and denied by the court as not material to his defense, would not have affected the outcome of his trial and was therefore neither material nor exculpatory.

Generally, we review an order limiting the scope of discovery only for an abuse of discretion. *United States v. Domina,* 784 F.2d 1361, 1372 (9th Cir.1986), *cert. denied,* 479 U.S. 1038, 107 S.Ct. 893, 93 L.Ed.2d 845 (1987). However, the question whether Rule 16(a)(1)(C) requires the government to provide out-of-district discovery constitutes a question of law reviewable de novo. *See United States v. Gatto,* 763 F.2d 1040, 1047 (9th Cir.1985) (*Gatto* ).

The district court limited discovery in this case to documents within the District of Oregon. (For convenience, we use the term "documents" to refer to all of the assorted objects subject to discovery under Rule 16(a)(1)(C).) The court did not base this ruling on the grounds that the documents sought by Bryan were not material or did not belong to him under Rule 16(a)(1)(C); rather, it agreed with Bryan that the prosecution must produce all brochures, seminar outlines, and letters from Bryan's attorneys, but limited its order to documents within the District of Oregon. We must thus decide the question whether the prosecution's discovery obligation under Rule 16(a)(1)(C) is limited to documents physically present in the district in which the prosecution is brought. We have not previously had occasion to address this question. *Cf. Gatto,* 763 F.2d at 1047 (declining to resolve the question whether documents in the possession of Federal Bureau of Investigation (FBI) agents both within and outside the district were "in the possession of the government" for the purposes of Rule 16(a)(1)(C)).

The prosecution argues that under Rule 16(a)(1)(C), it is obligated to provide doc-uments only if they are in the actual pos-session of the prosecution. According to the prosecution, "in the possession of the government" means in the possession of the *prosecutor.* The government relies on *United States v. Polizzi,* 801 F.2d 1543 (9th Cir.1986) (*Polizzi* ), and *Gatto,* 763 F.2d 1040.

In *Polizzi,* we held that for *Jencks Act* purposes, "in the possession of the United States" meant "in the possession of the prosecutor." 801 F.2d at 1552. We did not, however, decide the question whether a defendant was entitled under Rule 16(a)(1)(C) to discovery of out-of-district documents in the possession of investiga-tive agencies closely connected to the pros-ecution. *See id.* In *Gatto,* the defendant argued that he was entitled under Rule 16(a)(1)(C) to documents in the "construc-tive possession" of FBI agents in Sacra-mento and Salt Lake City. We observed that the Fifth Circuit had stated in dictum that under 16(a)(1)(C) "the government" in-cluded both "the prosecutor and closely connected investigative agencies." 763 F.2d at 1047, *citing United States v. Trevi-no,* 556 F.2d 1265, 1272 (5th Cir.1977). We declined, however, to reach the question whether documents in the possession of FBI agents were discoverable under Rule 16(a)(1)(C) after concluding that the FBI agents in that case did not have actual possession or control of the information sought by the defendants. 763 F.2d at 1049. Therefore, neither *Polizzi* nor *Gatto* is authority for the proposition that a pros-ecutor may refuse to provide discovery un-der Rule 16(a)(1)(C) of out-of-district doc-uments in the possession of closely con-nected investigative agencies.

Bryan argues that the "government" as it is used in Rule 16(a)(1)(C) includes both the prosecutor and closely connected inves-tigative agencies. He argues that the scope of the government's obligation to provide documents in a given case would best be defined by examining the prosecu-tion's knowledge of and access to relevant information. Bryan asserts the investiga-tion in this case was nationwide, that it was coordinated through the IRS national of-

fice, and that the IRS case agent in Oregon provided documents to and received documents from the nationally coordinated investigation. He thus asserts that because the United States Attorney in Oregon had knowledge of and access to documents gathered under the auspices of the nationally coordinated investigation, the district court erred in concluding that the prosecutor need not provide discovery of any out-of-district documents.

■ We find Bryan's argument persuasive that information "in the possession of the government" under Rule 16(a)(1)(C) may sometimes include out-of-district documents of which the prosecutor has knowledge and to which the prosecutor has access. Nothing in the text of Rule 16(a)(1)(C) suggests that the government's obligation to allow a defendant "to inspect and copy or photograph" documents within its possession which are "material," or are intended to be used in the government's case-in-chief, or were obtained from or belong to the defendant is satisfied by turning over only those documents physically located within the district in which the defendant is tried. Moreover, as Judge Coyle observed in *United States v. Robertson,* 634 F.Supp. 1020 (E.D.Cal.1986) (*Robertson*), *aff'd,* 815 F.2d 714 (9th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 258, 98 L.Ed.2d 215 (1987), "[l]imiting 'government' to the prosecution alone unfairly allows the prosecution access to documents without making them available to the defense." *Id.* at 1025.

The government argues that even if the prosecutor must provide documents within the possession of closely connected investigative agencies, Rule 16(a)(1)(C) should not be construed to require the prosecutor to turn over documents obtained through separate investigations of the defendant conducted in other locations. We agree that a federal prosecutor need not comb the files of every federal agency which might have documents regarding the defendant in order to fulfill his or her obligations under Rule 16(a)(1)(C). "[G]iving 'government' its broadest reading by expanding it to include all federal agencies (such as the

IRS) would not only wreak havoc, but would give the defense access to information not readily available to the prosecution." *Id.* However, we do not believe that adopting a mechanical definition of "government" that would deny to the defendant documents accessible to the prosecution would reflect a fair balance of the competing concerns of the government and the defendant in this case. *Id.* Rather, we agree with *Robertson* that the scope of the government's obligation under Rule 16(a)(1)(C) should turn on the extent to which the prosecutor has knowledge of and access to the documents sought by the defendant in each case. *Id.* The prosecutor will be deemed to have knowledge of and access to anything in the possession, custody or control of any federal agency participating in the same investigation of the defendant.

In the present case, it does not appear that the district court based its decision to deny out-of-district discovery on considerations of the Oregon United States Attorney's knowledge of and access to the documents sought by the defendant. Nor can we determine, on the basis of the record before us, the extent to which the prosecution had knowledge of and access to the documents described in Bryan's discovery motions. We must, therefore, remand this issue to the district court for a determination whether Bryan was deprived of documents which the prosecution had knowledge of and access to in the present case. In addition, because the district court found that the prosecutor had no obligation to produce out-of-district documents, the district court did not address the question whether Bryan made a sufficient showing that the out-of-district documents he requested were either "material" to his defense or "belong[ed] to" him within the meaning of Rule 16(a)(1)(C). In light of the district court's ruling that certain of the documents (*e.g.,* attorney letters and brochures) requested by Bryan were discoverable under Rule 16(a)(1)(C) if located within the district, we cannot analyze the effect, based on the record before us, that the unavailability of these and similar documents from outside the district (if they

exist) had on the outcome of his trial. We therefore vacate Bryan's conviction and remand to the district court for a determination whether Bryan was erroneously denied access to out-of-district documents to which he was entitled under Rule 16(a)(1)(C). If the district court determines that Bryan was denied such documents, then it must evaluate whether Bryan was prejudiced. *See* Fed.R.Crim.P. 52(a).

■ If the district court determines that the prosecution had knowledge of and access to potentially exculpatory *Brady* evidence outside the district, then it will have to determine whether such evidence was "material." *See United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). As with Rule 16(a)(1)(C)'s definition of government, we see no reason why the prosecutor's obligation under *Brady* should stop at the border of the district. If a federal prosecutor has knowledge of and access to exculpatory information as defined in *Brady* and its progeny that is outside the district, then the prosecutor must disclose it to the defense.

■ We reject, however, Bryan's contention that the district court erroneously concluded that certain statements made by members of the taxpayer class allegedly victimized by his scheme were neither material nor exculpatory. He argues that because the prosecution alleged that Bryan made false representations to members of the class of victims described in the indictment, *any* statement by *any* member of this class in which such false representations were *not* mentioned or reported is exculpatory within the meaning of both *Brady* and Rule 16(a)(1)(C). Bryan seems to argue that any information gleaned from any witness by a federal prosecutor that does not incriminate the defendant necessarily exculpates him. This proposition is supported by neither law nor logic. If the prosecution were required to turn over any statement of a witness that did not fully incriminate the defendant, it would be required to report statements of virtually any witness it did not intend to call at trial. This clearly does not represent the law of this circuit. *See United States v. Cadet*, 727 F.2d 1453, 1469 (9th Cir.1984) (although the prosecution may be required to reveal the names and addresses of witnesses to the offenses charged in the indictment, it has no obligation to produce statements of witnesses it does not intend to call at trial). We hold, therefore, that the district court did not abuse its discretion in denying Bryan's motion for discovery of witness statements and grand jury testimony.

### III

■ Bryan contends that Counts 1 through 20 of the indictment are duplicitous because they allege two different schemes: the first to defraud taxpayers, and the second to defraud the government. We review the question whether counts of an indictment are duplicitous de novo. *United States v. Aguilar*, 756 F.2d 1418, 1421–22 (9th Cir.1985). We "look to the indictment itself to determine whether it may fairly be read to charge but one crime in each count." *United States v. Morse*, 785 F.2d 771, 774 (9th Cir.) (*Morse*), cert. denied, 476 U.S. 1186, 106 S.Ct. 2925, 91 L.Ed.2d 553 (1986).

The essence of Bryan's argument is that the counts charging him with a scheme to defraud both taxpayers and the United States Treasury necessarily charge two distinct crimes. According to Bryan, a count in an indictment cannot allege a single scheme to defraud if the scheme is alleged to have multiple ends. From this premise, Bryan argues that where, as here, a scheme to defraud is targeted at two distinct classes of victims, it necessarily has multiple ends, and is thus duplicitous as a matter of law.

We have previously rejected Bryan's argument that a single count alleging that the defendant schemed to defraud a variety of victims is necessarily duplicitous. In *United States v. Mastelotto*, 717 F.2d 1238 (9th Cir.1983) (*Mastelotto*), we held that "'the defrauding of *different people* over an extended period of time, using *different means and representations*, may constitute but one scheme.'" *Id.* at 1245, *quot-*

*ing Owens v. United States,* 221 F.2d 351, 354 (5th Cir.1955). As long as "the set of fraudulent transactions alleged in a count is within the conceivable contemplation of a greedy mind, no duplicity has occurred." *Id.* at 1244. Thus, that the scheme alleged in Counts 1 through 20 was alleged to have defrauded two sets of victims does not require a finding that two separate "schemes" existed. *Id.* at 1245; *see also Morse,* 785 F.2d at 774 (rejecting a duplicity challenge to an indictment alleging that four separate tax shelter ventures involving different victims comprised a single "scheme to defraud"). Moreover, we do not believe that the most natural reading of the facts as alleged in the indictment would lead to the conclusion that there were two separate schemes: one to defraud the participants and one to defraud the government. Many, if not most illegal tax shelter promotion schemes will have the intended effect of defrauding the specific taxpayers who are induced to participate in the shelters of their investment and of defrauding the United States of tax revenue. Thus, that the scheme has two types of victims is its natural and intended consequence; this fact alone does not require a finding that two schemes existed. Finally, as we have previously observed, the use of different means and misrepresentations made in different contexts may also constitute part of a single scheme. *Mastelotto,* 717 F.2d at 1245. We hold, therefore, that Counts 1 through 20 of the indictment may fairly be read to charge a single crime in each count. *Morse,* 785 F.2d at 774.

## IV

Bryan's next argument is ancillary to his last. He contends that the court violated his right to a unanimous verdict by instructing the jury that it could convict him if it found that he committed either of two frauds: the first directed at taxpayers, the second directed at the United States Treasury. The district court's Jury Instruction 12 stated in part that "the government [must] prove ... [t]hat defendant Bryan devised a scheme which was reasonably calculated to defraud a group of taxpayers and/or the United States by

inducing the ... taxpayers to claim false deductions on their tax returns; and ... [t]hat ... Bryan ... acted with the specific intent to defraud the group of taxpayers and/or the United States...." Bryan argues that this instruction created a dangerous probability that the jury's verdict was nonunanimous because the court failed to supplement this instruction with a specific unanimity instruction reminding the jury that all twelve must agree about the identity of the intended victims.

Under Rule 30 of the Federal Rules of Criminal Procedure,

> [n]o party may assign as error *any portion* of the charge or omission therefrom *unless that party objects* thereto before the jury retires to consider its verdict, *stating distinctly the matter to which that party objects and the grounds of the objection.*

(Emphasis added.) Bryan's attorney had several opportunities to bring the alleged unanimity problem to the court's attention. He failed to do so. He did not request a specific unanimity instruction in his proposed instructions. During the jury instruction conference among the district judge, the prosecutor, and Bryan's attorney, the parties examined and discussed each of the instructions the court planned to give. At no point did Bryan's attorney raise the subject of unanimity. After the judge instructed the jury, Bryan's attorney presented many objections, including to Instruction 12. His objection, however, rested on a different ground. He also renewed his request to charge his own version of Instruction 12 (and ten other instructions), but did not specify the grounds upon which he made this request. Because Bryan at no point raised a unanimity objection or requested a unanimity instruction specifically tailored to the problem allegedly created by Instruction 12, we review the instruction for plain error. *United States v. Payseno,* 782 F.2d 832, 834 (9th Cir.1986). To determine whether "plain error" occurred in this case, we inquire whether the alleged error was highly prejudicial and whether the error affected the substantial rights of the defendant. *United States v.*

*Hutson,* 843 F.2d 1232, 1238 (9th Cir.1988). There must be a high probability that the error materially affected the verdict. *United States v. Williams,* 685 F.2d 319, 321 (9th Cir.1982) *(Williams).* Moreover, "[r]eversal of a criminal conviction on the basis of plain error is an exceptional remedy, which we invoke only when it appears necessary to prevent a miscarriage of justice or to preserve the integrity and reputation of the judicial process." *United States v. Bustillo,* 789 F.2d 1364, 1367 (9th Cir.1986) *(Bustillo)* (citations omitted).

Absent special factors indicating that there is a genuine possibility of jury confusion—such as the complex nature of the evidence or a discrepancy between the evidence and the indictment—a defendant is not entitled to a specific instruction that the jury must agree on a particular set of facts. *United States v. Feldman,* 853 F.2d 648, 652 (9th Cir.1988) (amended Oct. 19, 1988) *(Feldman), citing United States v. Frazin,* 780 F.2d 1461, 1468 (9th Cir.) *(Frazin), cert. denied,* 479 U.S. 844, 107 S.Ct. 158, 93 L.Ed.2d 98 (1986). Just as in *Feldman,* there is no plain error here. In *Feldman,* we observed that "[a]lthough [Feldman's] real estate transactions were complicated, they had to be convoluted to avoid his creditors." *Feldman,* 853 F.2d at 653. The evidence in this case was no more complex than that involved in *Feldman.* In addition, in this case there was no discrepancy between the indictment and the evidence. The indictment alleged one unified scheme to defraud and the evidence did not create any ambiguity as to the possible existence of multiple schemes. The jury was instructed, as in *Frazin,* that the government must prove beyond a reasonable doubt the existence of a scheme to defraud, was instructed on the meaning of reasonable doubt, and was advised that the jury verdict must be unanimous. *See also id.* at 653.

Nor does Bryan support his claim of a genuine possibility of jury confusion by pointing to "any action of the jury, such as requesting clarification of the instruction." *Id.* at 653; *see also United States v. Echeverry,* 698 F.2d 375, 376, *amended,* 719 F.2d 974 (9th Cir.1983) (per curiam). In addi-

tion, as in *Feldman,* the district judge advised the jury generally of its obligation to render a unanimous verdict, and repeatedly referred to "a" or "the" scheme, rather than to "some" or "any" scheme. *Feldman,* 853 F.2d at 653.

Indeed, the only "special factor" pointed to by Bryan which had any potential to cause jury confusion is the language of Jury Instruction 12. While we agree that the instruction could have been clearer, we do not consider it highly probable that its inartful wording materially affected the verdict. *See Williams,* 685 F.2d at 321. It is true that in *Mastelotto* we held jury instructions inadequate partly because they made reference to "a scheme." 717 F.2d at 1249–50. Yet, *Mastelotto* differs in several important ways from this case. First, in *Mastelotto* the instructions also "affirmatively stated that, even if any particular juror did find the existence of several 'schemes,' the juror could nonetheless vote for conviction if the mailing or phone call charged was in furtherance of at least 'a scheme in which that defendant was a participant.'" *Id.* (emphasis added). Thus, the instructions themselves pointed to the possibility of there being two schemes. Second, *Mastelotto* involved "two distinct sorts of fraudulent transactions." *Id.* at 1241. The case involved both (1) the sale of mislabeled oil products by a corporation and its subsidiaries to obtain higher prices and (2) the later corporate sale of the subsidiaries themselves based on earnings figures that included income derived from the fraudulent sales of oil products. These fraudulent transactions are more distinct than the transactions in this case. Selling oil and selling a company are separate actions that occurred at different times. In this case, helping the investors set up fraudulent tax shelters was an action that arguably defrauded both the taxpayers and the government simultaneously. In any case, the fraudulent transactions here were less distinct. Third, and most important, *Mastelotto* was not a plain error case: counsel had specifically requested a specific unanimity instruction at trial. Thus, *Mastelotto* does not control this case.

Thus, we hold that the district judge did not commit plain error by failing to submit a specific unanimity instruction. Bryan is not entitled to the "exceptional remedy" of reversal under the plain error standard. *Bustillo,* 789 F.2d at 1367.

## V

We have carefully considered Bryan's other contentions and conclude that they are without merit. We vacate Bryan's conviction and remand to the district court for a determination whether Bryan was denied access to documents to which he was entitled under Rule 16(a)(1)(C) or *Brady.* On remand, the district court should determine whether the prosecutor had knowledge of and access to documents in the possession of closely related federal investigatory agencies that were either material to Bryan's defense or belonged to him within the meaning of Rule 16(a)(1)(C). In addition, the district court should determine whether such documents, if they exist, were *Brady* evidence, and, if so, whether they were material within the test announced in *Bagley.* If neither Rule 16(a)(1)(C) nor *Brady* was violated, conviction may be reinstated. If the court determines there was a violation of Rule 16(a)(1)(C) or *Brady,* the court will need to determine whether a new trial is necessary.

VACATED AND REMANDED.